# IN THE COURT OF APPEALS OF IOWA

No. 24-0742
Filed December 3, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ROBERT JOSEPH ARKFELD JR.,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Shelby County, Jennifer Benson Bahr, Judge.


A defendant appeals his conviction for serious injury by intoxicated operation of a motor vehicle. **REVERSED AND REMANDED.**


Robert G. Rehkemper (argued) of Gourley, Rehkemper, & Lindholm, P.L.C., West Des Moines, for appellant.

Brenna Bird, Attorney General, Kevin Cmelik (argued) (until withdrawal), Special Counsel, and Zachary Miller, Assistant Attorney General, for appellee.


Heard at oral argument by Greer, P.J., and Badding and Chicchelly, JJ.

**BADDING, Judge.**

We filed our opinion in this appeal on October 29, 2025, but then granted the appellant's petition for rehearing. That opinion is vacated, *see* Iowa R. App. P. 6.1204(5)(c), and replaced by this one.

At the end of a long day of harvesting, Robert Arkfeld was crossing a highway in his tractor when a motorcyclist crashed into him and died. Arkfeld's urine later tested positive for cocaine metabolites. He was charged with homicide by intoxicated operation of a motor vehicle, but a jury found him guilty of the lower offense of serious injury by intoxicated operation in violation of Iowa Code section 707.6A(4) (2022).

Arkfeld appeals, claiming the district court erred in denying his motion to suppress because law enforcement lacked probable cause to transport him from the crash scene to the sheriff's office for an evaluation by a drug recognition expert and because the search warrant authorizing withdrawal of blood and urine samples was invalid. He also challenges the sufficiency of the evidence, the exclusion of evidence about the motorcyclist's intoxication, and the district court's refusal to give his proposed jury instructions on causation.

Although we find that the court correctly denied Arkfeld's suppression motion, we conclude under *State v. Adams*, 810 N.W.2d 365 (Iowa 2012) that the State failed to offer sufficient evidence that Arkfeld's intoxicated operation of the tractor caused the motorcyclist's death. We accordingly reverse Arkfeld's conviction for serious injury by intoxicated operation of a vehicle and remand for entry of judgment on the lesser-included offense of operating while intoxicated. As a result, we do not reach the evidentiary or instructional issues.

## I.     Background Facts and Proceedings

On September 22, 2022, Robert Arkfeld was in the middle of a busy harvest season, working from sun-up until sun-down to get the crops out of the fields. As the sun was setting on the day, Arkfeld started on his last task—moving an eighty-foot auger to a nearby farm. Brandon Schwery, a young man who helped Arkfeld farm, had just finished some mechanical work on a semi-truck and called Arkfeld to see if he needed anything. Arkfeld asked Schwery for help with the auger.

The two men hooked the auger to Arkfeld's tractor and got it lined up on a gravel driveway abutting Highway 59 in Shelby County. Arkfeld was driving the tractor with the auger, and Schwery was behind him in a pickup truck. As they pulled up the driveway, Arkfeld switched the tractor's perimeter lighting to highway lights and turned the flashers on. Schwery would later testify that all the lighting on the tractor is LED, "so they're pretty bright lights." Because it was dark outside by then, Schwery also turned the truck's flashers on as an "extra caution."

Arkfeld waited at the driveway for five to ten minutes for traffic to pass by on the highway. Schwery testified that Arkfeld wasn't in a hurry and "was just waiting to go" until he saw an opening. After "quite a bit of time," Schwery saw the auger in front of him start to move. Schwery could see the highway, but he couldn't see oncoming traffic from his position behind the tractor and auger. As the tractor reached the center line, both men heard a bang and saw a motorcycle tumble away from the tractor. Arkfeld called 911 and instructed Schwery to do the same. While on the phone with dispatch, Schwery went to check on the motorcyclist but immediately recognized that he had died. Meanwhile, Arkfeld moved the tractor off the highway and waited for emergency personnel to arrive.

Captain Chad Butler of the Shelby County Sheriff's Office got to the scene at about 8:25 p.m. He spoke to Arkfeld, who was waiting by the tractor. Arkfeld told Captain Butler that he didn't see the motorcycle until the very last minute. After ensuring that Arkfeld did not need medical attention, Captain Butler asked him to stay by the tractor while he directed the scene and waited for the Iowa State Patrol to arrive. Captain Butler later testified that although he was not focused on Arkfeld, he did not observe any signs that Arkfeld was impaired by alcohol or drugs.

Trooper Adrian Long arrived at the scene around 9:00 p.m. After evaluating the scene, he walked over to Arkfeld, who was still by the tractor. Trooper Long testified that Arkfeld was "laying his head on the left rear tractor tire, almost kind of like a lethargic type movement." He brought Arkfeld to his squad car for an interview. Once inside the car, Trooper Long read Arkfeld his *Miranda* rights and asked him what happened. Arkfeld explained that he was pulling out of the driveway and saw a light "but thought it was way down there." When he was about to the centerline of the highway, Arkfeld said that he saw the motorcyclist hit the front of the tractor. Trooper Long asked Arkfeld whether he had ingested any alcohol or drugs that night, and Arkfeld said no.

To eliminate "any and all factors for cause" of the accident, Trooper Long testified that he asked Arkfeld to perform three standardized field sobriety tests: horizontal gaze nystagmus, walk-and-turn, and one-leg stand. Arkfeld agreed but informed the trooper that he had glaucoma, tunnel vision, and bad knees. Trooper Long testified that he observed "possible impairment" from Arkfeld's performance on the tests, which are only validated to detect alcohol intoxication. But Arkfeld blew 0.00 on a preliminary breath test, and Trooper Long was not trained to detect

physical indicators of drug use. With alcohol ruled out—and Trooper Long later admitting that he had "no idea" what was causing the possible impairment—he transported Arkfeld to the sheriff's office for an evaluation by Chief Deputy Cody Eckles, a drug recognition expert.

Deputy Eckles performed a twelve-step drug recognition test, which he found showed signs of a central nervous system stimulant, like cocaine. The signs that the deputy observed, however, didn't correlate to that drug category. For instance, Deputy Eckles found that Arkfeld had horizontal gaze nystagmus, which is associated with central nervous system depressants, such as alcohol. He also found that Arkfeld's pupils were normal, as was his pulse rate. But individuals who are impaired by stimulants have dilated pupils and elevated pulses. The only indicator consistent with use of a stimulant was Arkfeld's slightly elevated blood pressure. Without noting these discrepancies, Deputy Eckles applied for a search warrant to authorize the withdrawal of blood and urine samples from Arkfeld.

The warrant was granted, and Arkfeld's urine sample later tested positive for three metabolites of cocaine.[1] While Arkfeld was at the sheriff's office, another officer found a baggie of cocaine inside an eyeglass case that had been tossed into a corn field near the crash site. DNA recovered from the glasses inside the case matched Arkfeld's DNA profile. Arkfeld was arrested and charged with homicide by intoxicated operation of a vehicle in April 2023.

---

[1] A blood sample was also obtained from Arkfeld pursuant to the search warrant, but the district court prohibited the State from introducing evidence about the test results because the State failed to lay a proper foundation for that evidence. *See State v. Shelton*, 176 N.W.2d 159, 160 (Iowa 1970).

After conducting discovery, Arkfeld filed a motion to suppress arguing that he was detained by Trooper Long and transported to the sheriff's office without probable cause. Arkfeld alternatively moved to suppress evidence obtained from the search warrant, which he contended was based on an affidavit with false and omitted statements. The district court denied the motion.

As the case neared the jury trial in March 2024, the court granted the State's motion in limine to exclude evidence that the motorcyclist had alcohol and marijuana in his system when he died. The court also ruled that Arkfeld's accident reconstructionist could not testify about the motorcyclist's speed before the crash. But at trial, the State asked its own reconstructionist—Trooper Aaron Nordyke—to testify about his speed calculation for the motorcyclist. Trooper Nordyke's calculation, which put the motorcycle traveling at fifty-six to fifty-seven miles per hour at the start of its skid marks, had not been disclosed to the defense. Because the State put the motorcyclist's conduct at issue with that testimony, the court revised its earlier ruling and allowed Arkfeld's reconstructionist—Dan Billington—to testify about his speed calculations. Billington's calculations concluded that the motorcyclist was traveling at approximately eighty-six miles per hour when he let off the throttle, eighty-one miles per hour at the start of the skid marks when he began to apply the brakes, and sixty-five miles per hour at impact.

After four days of evidence and another day of deliberation, the jury found Arkfeld guilty of serious injury by intoxicated operation of a motor vehicle. Arkfeld appeals.

## II.     Motion to Suppress

Invoking the Fourth Amendment to the United States Constitution, Arkfeld claims the district court erred in denying his motion to suppress for two reasons: (1) Trooper Long lacked probable cause to detain and transport him to the sheriff's office for the drug evaluation by Deputy Eckles; and (2) the search warrant application contained false statements, intentionally omitted material information, and was not supported by probable cause.  We review these constitutional claims de novo.  *State v. Harbach*, 3 N.W.3d 209, 217 (Iowa 2024).

### A.     Probable Cause for Transportation

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Evidence obtained in violation of this provision is inadmissible, "no matter how relevant or probative the evidence may be."  *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005) (citation omitted).  A warrantless search or seizure is per se unreasonable unless one of the exceptions to the warrant requirement applies.  *State v. Bradford*, 620 N.W.2d 503, 506 (Iowa 2000).

"One such exception is an investigatory '*Terry*' stop."  *Id.*  Under *Terry*, "police may detain persons in the absence of probable cause if the police have reasonable suspicion to believe criminal activity is taking place."  *State v. Pals*, 805 N.W.2d 767, 774 (Iowa 2011); *see also Terry v. Ohio*, 392 U.S. 1, 27 (1968).  Arkfeld argues that Trooper Long exceeded the scope of an allowable *Terry* stop by transporting him to the sheriff's office.  As a result, Arkfeld contends the trooper needed probable cause for the "investigative detention."  *See Dunaway v. New York*, 442 U.S. 200, 214–15 (1979) ("Nothing is more clear than that the Fourth

Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'"). We agree.

As our supreme court recognized in *Bradford*, "the removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause." 620 N.W.2d at 507 (citation omitted). "In such a case there is no such thing as a '*Terry* transportation.'" *Id.* The State argues while that is "certainly true as applied to the facts of *Bradford*," it should not apply to operating while intoxicated cases. Because we are bound by our supreme court's precedent, we reject the State's request to carve out an exception for that category of cases.[2] *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014) ("We are not at liberty to overrule controlling supreme court precedent.").

---

[2] The case that the State cites in support of this request—*State v. Dennison*, 571 N.W.2d 492 (Iowa 1997) (per curiam)—is distinguishable. The issue in *Dennison* was "whether the defendant was 'arrested' for purposes of the speedy indictment rule after law enforcement officers tested him to determine whether he was under the influence of alcohol and/or drugs." 571 N.W.2d at 493. At the time, Iowa courts "had consistently interpreted Iowa Rule of Criminal Procedure 2.33(2)(a) as being triggered by a statutory arrest, not mere Fourth Amendment custody." *State v. Williams*, 895 N.W.2d 856, 868 (Iowa 2017) (Mansfield, J., concurring specially); *see also Dennison*, 571 N.W.2d at 495 ("This court has also rejected the contention that a de facto arrest triggers the speedy indictment time."). Thus, the *Dennison* court concluded there was no formal "arrest" within the meaning of the procedural rule because the implied consent statute "allows a police officer to request a chemical test without placing the individual under arrest." 571 N.W.2d at 496. The speedy indictment rule is not at issue here, implied consent was not invoked, and we are not concerned with whether there was a statutory arrest; the question in this case is constitutional. *See Bradford*, 620 N.W.2d at 506 ("The Fourth Amendment's protections are not limited to 'traditional' arrests; indeed, a clear deprivation of liberty caused by law enforcement officers without formal words is nonetheless an arrest." (cleaned up)).

Turning to the question of probable cause, our supreme court has explained that probable cause

> exists when the facts and circumstances within the arresting officer's knowledge would warrant a person of reasonable caution to believe that an offense is being committed.
> The facts must rise above mere suspicion but need not be strong enough to sustain a guilty conviction. All of the evidence available to the arresting officer may be considered, regardless of whether or not each component would support a finding of probable cause by itself. Seemingly innocent activities may combine with other factors to give an experienced police officer reasonable grounds to suspect wrongdoing.

*Bradford*, 620 N.W.2d at 508 (cleaned up). In reviewing the district court's ruling on this issue, we "consider both the evidence introduced at the suppression hearing as well as the evidence introduced at trial." *State v. Palmer*, 791 N.W.2d 840, 844 (Iowa 2010).

Because alcohol was ruled out by Trooper Long at the scene, Arkfeld focuses on whether the trooper had reasonable grounds to believe that he had ingested a controlled substance. He points out that no drugs or drug paraphernalia were found at the scene before he was transported.[3] He also notes that witnesses denied seeing any physical indicators of drug use. Trooper Long did not smell any

---

[3] In arguing that probable cause existed for the detention, the State relies on facts learned by law enforcement after Arkfeld was transported to the sheriff's office, including the cocaine that was found in the corn field. However, for the probable-cause inquiry, we must confine our review to the information known by officers at the time Arkfeld was taken from the scene. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) ("To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed form the standpoint of an objectively reasonable police officer, amount to probable cause." (cleaned up)); *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983) ("Facts that occur or come to light subsequent to the arrest are irrelevant to a determination of whether probable cause existed at the time of the arrest.").

drugs or masking odors, and he agreed that Arkfeld was quiet, calm, and cooperative. Schwery also described Arkfeld as "normal" before the accident—"[m]aybe a little tired, but nothing out of the ordinary." And Captain Butler agreed that he didn't notice any signs that Arkfeld was impaired "by any sort of drug, alcohol, or controlled substance" when he talked to him.

But even though he did not observe evidence of drug use, Trooper Long—who had a longer and more focused interaction with Arkfeld than Captain Butler—testified that he did observe signs at the crash scene that Arkfeld was impaired. Those signs included bloodshot and watery eyes, mumbled speech, "unsteady gait and/or unsteady balance," "impairment of judgment," and drowsiness. Trooper Long testified that he also observed "clues of impairment" from the three field sobriety tests, which Arkfeld failed. Although the trooper did not know what was causing Arkfeld's impairment, we have held that similar objective signs of impairment are sufficient to establish probable cause for the issuance of a search warrant. *See State v. Wenzel*, 987 N.W.2d 473, 483 (Iowa Ct. App. 2022) (concluding a deputy's observation of "bloodshot and watery eyes, slurred speech, impaired judgment, and poor driving" provided probable cause to issue a search warrant for a blood sample).

We think the same reasoning should apply here in the detention context. As we said in *Wenzel*, "[w]hile objective observations, such as slurred speech, can be indicia of intoxication by alcohol or by drugs, the more difficult task of identifying the specific level of drug usage to show impairment should not serve as an impediment to enforcement." *Id.* Although Trooper Long was not trained as an expert in drug recognition, he testified that he was trained to recognize physical

signs of a driver's impairment. *Id.* at 485. Based on that training, the trooper testified that Arkfeld was exhibiting "some kind of impairment." "While there might conceivably be innocent explanations, probable cause does not require certainty." *State v. Tipton*, 897 N.W.2d 653, 687 (Iowa 2017). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted). In sum, probable cause "is not a high bar." *Id.* (citation omitted).

Considering the totality of the circumstances, and giving deference to the district court's implicit credibility determination in favor of Trooper Long, *see State v. Hunt*, 974 N.W.2d 493, 496 (Iowa 2022), we conclude the trooper had probable cause to detain Arkfeld and transport him to the sheriff's office.

**B.     Search Warrant**

Arkfeld next claims that Deputy Eckles made "material misstatements" and "intentional and/or reckless omissions of information" in the search warrant application, which "undermined any probable cause conclusions" by the magistrate who issued the warrant. He also claims that "even with the false statements and without considering the omitted information, the search warrant application failed to establish probable cause to withdraw" his urine and blood. We reject both claims.

*1.     Material misstatements and omissions of information.* As our supreme court recently explained in *Harbach*:

> Affidavits included in search warrant applications are presumed to be true. To overcome that presumption, a defendant challenging the veracity of a warrant application must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

included by the affiant in the warrant affidavit." If that preliminary showing is made, the court holds a hearing—referred to as a "*Franks* hearing"—where evidence may be presented to show whether the statements are knowingly or recklessly false. A defendant may also challenge the warrant application as intentionally omitting material facts that, if included, would cast doubt on the existence of probable cause.

3 N.W.3d at 218 (citations omitted); *see also Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

At the outset, the State contends the "issue of a false affidavit to support a warrant application was not properly before" the district court because "Arkfeld did not request a *Franks* hearing or make a preliminary showing of falsity." Instead, he raised the issue in his motion to suppress. The State objected to the procedural defect in its resistance to the suppression motion and at the suppression hearing when Arkfeld cross-examined Deputy Eckles about the issue. *Cf. Harbach*, 3 N.W.3d at 218 (finding the State waived any procedural challenges by not objecting to the lack of a preliminary showing). The district court overruled the State's objection and allowed testimony about the *Franks* issue, which it then denied in its ruling. Since an evidentiary hearing was held and a ruling was issued, we elect to proceed to the merits.

Arkfeld's motion to suppress asserted that Deputy Eckles knew field sobriety tests are not validated for use in assessing drug impairment and that he knew Arkfeld did not show signs of having used a central nervous system stimulant, even though that's what the deputy concluded was causing Arkfeld's impairment. His brief in support of the motion also argued that the deputy failed to disclose that Arkfeld passed some of the drug recognition tests. Because that information was omitted from the search warrant application, Arkfeld argued that

Deputy Eckles falsely or misleadingly swore that he had probable cause to believe Arkfeld was "under the influence of alcohol and/or drugs." The district court rejected these arguments, concluding that Deputy Eckles "considered the testing results as signs of impairment even if they did not conclusively prove impairment" and that he was not required to disclose exculpatory information or identify the specific drug category causing the impairment. We agree.

"The *Franks* doctrine applies to 'situations involving the omission of crucial information from a warrant application as well as the inclusion of inaccurate information.'" *Id.* at 222 (citation omitted). "When a defendant challenges omitted information," as Arkfeld does here, "he must show '(1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.'" *Id.* (citation omitted). Arkfeld failed to make that showing.

At the suppression hearing, Deputy Eckles agreed that the field sobriety tests administered to Arkfeld—and described in the warrant application—had not been validated to assess "any particular type of drug . . . other than alcohol." But the deputy testified the results can indicate impairment, which he defined to mean the "inability to operate a motor vehicle safely." Thus, in the warrant application, Deputy Eckles listed the results of the field sobriety tests—including that Arkfeld blew 0.00 on the preliminary breath test—as part of his observations of impairment. Other signs of impairment listed in the application included Trooper Long's observations of Arkfeld at the scene, Arkfeld falling asleep on the way to the

sheriff's office, and Arkfeld's performance on the drug evaluation administered by Deputy Eckles.

We do not consider these observable signs of impairment misleading, even though the deputy did not include details about the limits of field sobriety testing, the drug recognition tests Arkfeld passed, or the deputy's suspicions about which category of drugs might have caused Arkfeld's impairment in the warrant application. *See id.* at 224 (finding a "deputy's failure to include every detail" about a defendant's injuries, which could explain his physical signs of impairment, "does not make the affidavit misleading"). And there is no indication from the record that Deputy Eckles intentionally or recklessly omitted these facts to make the application misleading. Instead, when asked why the facts were not included, the deputy testified that he didn't think they were relevant. "An officer is not required to include all facts in the warrant application, even those exculpatory to the defendant." *Id.* at 222. Nor is an officer's concentration on facts supporting a probable cause determination fatal to the warrant. *See State v. Ripperger*, 514 N.W.2d 740, 745 (Iowa Ct. App. 1994). Instead, the "core inquiry is whether the issuing judge was presented with sufficient evidence to determine whether probable cause existed under the totality of the circumstances." *Harbach*, 3 N.W.3d at 223. We conclude that standard was met here.

*2.    Probable cause.* We also conclude the search warrant application on its face established probable cause to issue the warrant. *See State v. Bracy*, 971 N.W.2d 563, 567 (Iowa 2022) ("When reviewing a warrant application, we examine only the information actually presented to the judge." (cleaned up)).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis . . . for conclud[ing]" that probable cause existed.

*Ripperger*, 514 N.W.2d at 746 (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)).

As the above standard suggests, probable cause to search "requires a probability determination as to the nexus between criminal activity, the things to be seized, and the place to be searched." *State v. Seager*, 341 N.W.2d 420, 427 (Iowa 1983). Arkfeld argues that "crucial nexus" is missing here because Deputy Eckles did not "provide any correlation" between the observations of impairment "and a conclusion that Arkfeld was suspected of being 'under the influence of an alcoholic beverage and/or other drug[s]' or that evidence of such an offense would be located in the place to be searched, Arkfeld's bodily fluids." We do not, however, "strictly scrutinize the sufficiency of the underlying affidavit." *Bracy*, 971 N.W.2d at 567 (citation omitted). Instead, we interpret it "in a common sense, rather than a hypertechnical, manner." *Id.* And because the law favors warrants, *see Harbach*, 3 N.W.3d at 213, we must "draw all reasonable inferences to support the judge's finding of probable cause and decide close cases in favor of upholding the validity of the warrant." *State v. Baker*, 925 N.W.2d 602, 614 (Iowa 2019).

Under that standard, we agree with the district court that "[w]hen reading the application as a whole, it is easily and logically inferable that law enforcement believed that evidence of drug usage would be revealed from the collection and

testing of a bodily specimen." Deputy Eckles described his training as a certified drug recognition expert "specializing in the recognition of impairment caused by alcohol and/or other drugs." Based on that training, the deputy stated that he knew "the collection of a specimen for forensic testing will aid my investigation and determine what role the use of alcoholic beverages, controlled substances, or drugs played in this traffic offense." He then listed the signs of impairment that law enforcement observed. Deputy Eckles was not required to "articulate which claimed observations [were] related to suspected alcohol impairment and which claimed observations were related to 'other drug(s),'" as Arkfeld contends. *See Wenzel*, 987 N.W.2d at 483–84 (rejecting a similar argument).

The totality of the circumstances presented in the warrant application—including Arkfeld's performance on the field sobriety tests and drug recognition evaluation, along with the observations of his bloodshot and watery eyes, mumbled speech, unsteady balance, impaired judgment, and drowsiness—were sufficient to establish probable cause for the withdrawal of bodily specimens.

## III. Sufficiency of the Evidence

The jury was instructed that to find Arkfeld guilty of serious injury by intoxicated operation of a motor vehicle, the State was required to prove:

> 1. On or about the 22nd day of September, 2022, in Shelby County, Iowa, the defendant operated a motor vehicle while any amount of a controlled substance was present, as measured in the defendant's urine.
> 2. The defendant's act of operating a motor vehicle while any amount of a controlled substance was present, as measured by the defendant's urine, unintentionally caused serious injury to [the motorcyclist].

Arkfeld claims the evidence was insufficient to establish either element. We review this claim for the correction of errors at law. *See State v. Cole*, 3 N.W.3d 200, 203 (Iowa 2024). "If substantial evidence supports the jury's verdict, we will uphold it. Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* (citations omitted). "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (citation omitted).

### A. Operating While Any Amount of Controlled Substance was Present

The State prosecuted Arkfeld under the third alternative means of violating Iowa Code section 321J.2—operating a motor vehicle "[w]hile any amount of a controlled substance is present in the person, as measured in the person's blood or urine." Iowa Code § 321J.2(1)(c); *see also id.* § 707.6A(1), (4) (tying the offense of serious injury by intoxicated operation to violations of section 321J.2). That statute defines "controlled substance" to mean "any drug, substance, or compound that is listed in section 124.204 or 124.206, or any metabolite or derivative of the drug, substance, or compound." *Id.* § 321J.1(4); *see also id.* § 124.206(2)(d) (listing cocaine and its derivatives as controlled substances). Our supreme court has interpreted this provision to impose a "zero-tolerance ban on driving with even nonimpairing metabolites" of prohibited drugs. *State v. Childs*, 898 N.W.2d 177, 187 (Iowa 2017).

While Arkfeld acknowledges that there were cocaine metabolites in his urine *after* the accident, he argues the State failed "to prove the contents of [his] urine *at the time* he operated the tractor." (Emphasis added.) Arkfeld points out that the State's expert witness—a criminalist in the toxicology section of the state crime lab—agreed that it is not possible to accurately estimate when a person used cocaine based on metabolites later detected in their urine. Arkfeld contends that impossibility, coupled with his access to cocaine following the collision, means the State failed "to rule out the possibility that Arkfeld ingested the substance after his operation of the vehicle ceased." We disagree.

The State is "not required to refute every possible inference from the evidence." *State v. Ernst*, 954 N.W.2d 50, 57 (Iowa 2021). "[W]hile a jury may not rely upon evidence that merely creates speculation, suspicion or conjecture, it may utilize all of the direct and circumstantial evidence, and the inferences from that evidence, in determining" whether the State has met its burden. *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008) (cleaned up). Direct and circumstantial evidence are equally probative, and "the State need not discredit every other potential theory to be drawn from circumstantial evidence." *Ernst*, 954 N.W.2d at 57. Consequently, although

> other conflicting scenarios can be postulated, a court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

*Id.* at 57–58 (cleaned up). Under these principles—and when viewing the evidence in the light most favorable to the State—a rational trier of fact could conclude that

the cocaine metabolites were present in Arkfeld's urine while he was operating the tractor.

The record established that a 911 call reporting the accident was made at 8:17 p.m. Captain Butler arrived at the scene at 8:25 p.m., where he encountered Arkfeld standing by the tractor. After a brief conversation, Captain Butler asked Arkfeld to "hang out" until the Iowa State Patrol arrived. Although Captain Butler was not focused on Arkfeld, he testified that Arkfeld did not leave the side of the tractor: "We were at the scene the entire time and were able to keep eyes on him." When Trooper Long arrived at the scene just before 9:12 p.m., Arkfeld was still by the tractor where Captain Butler had told him to wait. It's during this window of time—between the 911 call at 8:17 p.m. and Arkfeld being walked to Trooper Long's car at 9:12 p.m.—that Arkfeld contends he could have ingested cocaine.

In making this argument, Arkfeld relies on our supreme court's opinion in *State v. Creighton*, which held that "the fact a defendant was under the influence of an alcoholic beverage at the time of his arrest, without a showing of more, will not support a finding he was in that condition when driving a motor vehicle at some earlier time." 201 N.W.2d 471, 473 (Iowa 1972). Unlike *Creighton*, however, we know the length of time that passed between the accident and law enforcement's arrival on the scene. *Cf. id.* (declining to hold that a defendant found intoxicated by police was necessarily intoxicated at the time of his single-car accident "without any evidence concerning the length of the interval" between the two events); *see also State v. Zenchenko*, No. 22-1637, 2023 WL 4533286, at *2 (Iowa Ct. App. July 13, 2023) (distinguishing *Creighton* on similar grounds). We also know what

happened once law enforcement arrived: Arkfeld stayed by the tractor in proximity to officers.  And although cocaine was found at the scene, it was in an eyeglass case in a nearby field, not close at hand to Arkfeld.  True, there remains the eight-minute window between the 911 call and Captain Butler's arrival.  But as Arkfeld argued in support of his motion to suppress, he did not show physical signs at the scene that he had recently used a stimulant like cocaine.

A reasonable inference from the evidence is that rather than ingesting cocaine for the first time that day just after a fatal accident and while waiting for law enforcement to arrive—or ingesting it in their presence as he stood by the tractor—the cocaine metabolites in Arkfeld's urine were present in his person while he was operating the tractor.  *See State v. Jones*, 967 N.W.2d 336, 343 (Iowa 2021) ("While the defendant has an alternative explanation for the evidence, the jury was not required to accept the defendant's version of the events." (cleaned up)).  We accordingly find this element supported by substantial evidence.

## B.    Causation

Arkfeld's argument on the causation element is based on our supreme court's opinion in *Adams*, which the State contends "has vexed the legal community" ever since it was issued.  810 N.W.2d 368–72.  In *Adams*, the court examined the State's burden to prove causation under Iowa Code section 707.6A(1) for the offense of homicide by intoxicated operation of a motor vehicle.  *Id.* at 368.  Section 707.6A(1) provides that a person "commits a class 'B' felony when the person unintentionally causes the death of another *by* operating a motor vehicle while intoxicated, as prohibited by section 321J.2."  (Emphasis added.)  Section 707.6A(4), which criminalizes the lower offense of serious injury

by intoxicated operation, contains the same causation language: "A person commits a class 'D' felony when the person unintentionally causes a serious injury, as defined in section 702.18, *by* any of the means described in subsection 1 or 2." (Emphasis added.)

The defendant in *Adams*, who admitted to drinking three to five beers in the five hours before he hit a bicyclist with his car, argued the word "by" in section 707.6A expressed "a legislative intent that a conviction may be had under the statute only upon proof that the defendant's intoxication was the proximate cause of another's death." *Id.* The State countered that "the causal language 'by' only applies to 'operating a motor vehicle.'" *Id.* Thus, according to the State in *Adams*, "the death must be caused *by* the defendant's operation of a motor vehicle, and the defendant must be operating a motor vehicle *while* he is intoxicated, but the State need not prove the victim's death was caused by the defendant's intoxication to sustain a conviction." *Id.* at 368–69.

The court sided with the defendant, concluding:

[I]t is the State's burden under section 707.6A(1) to prove a causal connection between the defendant's intoxicated driving and the victim's death. Although the statute does not impose a burden on the State to prove a specific causal connection between the defendant's *intoxication* and the victim's death, it does require proof of a factual causal connection between a specific criminal act— "intoxicated driving"—and the victim's death. Put another way, the statute demands more than mere proof that the defendant's *driving* caused the death of another person. A defendant may be found guilty of homicide by vehicle only if the jury finds beyond a reasonable doubt that his criminal act of driving under the influence of alcohol caused the victim's death.

*Id.* at 371.

The State argues that it met that burden here because there is "no compelling evidence in this record that establishes that some other cause interrupted the defendant's act of intoxicated driving and the injury that occurred. Otherwise stated, [the motorcyclist], perhaps drunk and speeding, died because the defendant who was driving while drugged pulled into his path." Arkfeld replies that this argument misses the point. He contends the "crucial focus in a prosecution under section 707.6A is the impact that a substance detected in a person's system would have had on the individual's ability to safely operate a motor vehicle. It is not enough to merely establish the substance was present and the defendant's driving caused the collision." We agree.

As our supreme court recently reiterated, the factual causation analysis in *Adams* requires the State to have "proof that the defendant was actually under the influence, and not merely had vestiges of past [drug] use in their bloodstream." *State v. McGee*, 959 N.W.2d 432, 441 (Iowa 2021). That proof was missing here, even upon viewing the evidence in the light most favorable to the State. *See Crawford*, 972 N.W.2d at 202.

Although Arkfeld had three cocaine metabolites in his urine and cocaine was found at the scene, he denied using any substances the day of the accident. *Cf. State v. Schaul*, No. 15-0466, 2016 WL 2745934, at *3–4 (Iowa Ct. App. May 11, 2016) (finding sufficient evidence that defendant's intoxicated driving caused the accident where the defendant admitted drinking eight to ten beers the night of the collision). There was no evidence that Arkfeld was driving erratically or showing signs of impairment before the accident. *Cf. id.* at *4 (discussing testimony from an accident reconstructionist about the defendant's reckless driving

and descriptions of the defendant's impaired behavior from witnesses to the accident).  Schwery, who was helping Arkfeld move the auger, testified that Arkfeld waited five to ten minutes "for the traffic to go" before pulling out onto the highway. He also testified that Arkfeld was "[m]aybe a little tired" before the accident but otherwise "seemed normal."  Captain Butler, who briefly interacted with Arkfeld after the accident, did not observe any signs of intoxication.  While Trooper Long suspected that Arkfeld was impaired, the signs he detected—watery eyes, mumbled speech, unsteady balance, and drowsiness—were subtle enough to be missed by others at the scene.  And they were also consistent with the rigor involved in a long day of harvesting.

The State did present testimony from Deputy Eckles that the symptoms he observed were consistent with the "downside" of cocaine use, which the deputy explained was the body's attempt to return to homeostasis after drug use.  But the State presented no evidence that those symptoms—or the metabolites in Arkfeld's urine (two of which were inactive)—impacted his driving.  *Cf. State v. Sallis*, No. 23-1588, 2025 WL 1066522, at *6 (Iowa Ct. App. Apr. 9, 2025) (finding sufficient evidence that defendant's intoxicated driving caused the victim's death where an expert testified about the impact of alcohol and marijuana on a defendant's driving); *Schaul*, 2016 WL 2745934, at *4 (same).  Arkfeld, on the other hand, called a pharmacologist as a witness at trial who stated there was no way to determine whether the cocaine metabolites in Arkfeld's urine had any impact on his operation of the tractor.  And the State's own expert witness—a criminalist in the toxicology section of the state crime lab—acknowledged that cocaine metabolites can be detected in the urine up to three days after use.

We recognize that, as discussed above, the State prosecuted Arkfeld under the "per se ban" in Iowa Code section 321J.2(1)(c), which "prohibit[s] people from operating motor vehicles with controlled substances in their bodies, whether or not they are under the influence." *State v. Comried*, 693 N.W.2d 773, 776 (Iowa 2005); *accord Childs*, 898 N.W.2d at 184 (reaffirming the holding in *Comried* on appeal from a conviction under section 321.2(1)(c)). But in *Adams*, the court clarified that *Comried* "does not stand for the proposition that a conviction under [section 707.6A(1)] may be sustained without proof of a causal connection between the defendant's intoxicated driving and a death. Any language suggesting a contrary conclusion is dicta." 810 N.W.2d at 371 n.6; *but see State v. Hennings*, No. 22-0337, 2023 WL 2397045, at *3 (Iowa Ct. App. Mar. 8, 2023) (finding the State "was not required to prove that the methamphetamine in [defendant's] system 'in any way influenced' her driving" (citing *Childs*, 898 N.W.2d at 183)).

Returning to that key causal connection question, Arkfeld's accident reconstructionist measured the motorcyclist's speed before impact at eighty-six miles per hour and sixty-five miles per hour at impact. The reconstructionist also testified that there is extensive research on the challenges for reasonable and cautious motorists to identify motorcycles while driving, especially at night:

> The interesting thing about the situation like this with Highway 59 is that, as I indicated before, you can see up to three miles away. And, in fact, at nighttime when a vehicle crests that hill the furthest away and it's coming down the hill, you can see the light from that vehicle approaching. The distance however is so far off that when it's that far away the headlights of that vehicle converge and it appears to be one single light of a vehicle three miles away. . . . The dynamics and the geometry of that intersection as you stare and look to the south along Highway 59 are such that a vehicle such as a motorcycle that

only has one headlight, even if it is 2800 feet away, it appears in the same line or the same place within our field of view as the headlights of a vehicle three miles away.

He continued:

So you have still, if you saw a vehicle, a single light 3000 feet away, you may not realize that that's a motorcycle. You may assume that that's a car three miles away because you can't see the—the spa[t]ial reference of that vehicle at nighttime. And that's a problem. And it's not just in this case. It's in all cases involving motorcycles that have crashed or have accidents at nighttime.

The reconstructionist testified that he "saw no link or relationship to indicate there was any type of impairment or any indication of impairment in Mr. Arkfeld's operation of the tractor." Arkfeld's drug recognition expert came to the same conclusion. There was no contrary evidence from the State.

Under this record, we conclude there was insufficient evidence that the victim's death would not have occurred "in the absence of the defendant's criminal act—intoxicated driving." *Adams*, 810 N.W.2d at 372, 373 n.9 (noting that a "rational fact finder could have found Adams' alleged intoxicated driving was not the factual cause of [the victim's] death" because a sober driver "would have struck the victim," who was wearing dark clothing and bicycling late at night on a busy city street); *see also State v. Wieskamp*, 490 N.W.2d 566, 567 (Iowa Ct. App. 1992) (concluding that "a sober driver driving with reasonable care would have struck the victim lying in the street covered solely in dark clothing in an unlighted area of the highway").

We accordingly reverse Arkfeld's conviction for serious injury by intoxicated operation of a vehicle and remand for entry of judgment on the lesser-included offense of operating while intoxicated. *See State v. Morris*, 677 N.W.2d 787,

788–89 (Iowa 2004). Because of this resolution, we do not reach the evidentiary or instructional issues that Arkfeld contends prejudiced his defense on causation, which is not an element of the lesser-included offense.

**REVERSED AND REMANDED.**